CHARLES LASSITER v. SEABOARD AIR LINE RAILWAY.

(Filed 29 March, 1916.)

**1. Railroads—Master and Servant—Negligence—Proximate Cause—Instructions—Appeal and Error.**

The plaintiff, an employee of the defendant railroad company, was engaged at night in shoveling coal from one part of the tender of a locomotive to another, which was standing still, with evidence tending to show that he was injured while on the step, in leaving the cab, by a jar caused by another locomotive striking the one he was on, which approached without warning. *Held*, the jury might have inferred that the engines were being coupled for the purpose of moving the one he was on, and the question of negligence would then depend upon whether there was a jarring of unusual violence in such instances; or whether the train approached without warning; and while the fact that the jarring caused the plaintiff's injury would be some evidence of defendant's actionable negligence, it would be insufficient to establish as a matter of law; and, further, an instruction to that effect would be reversible error, in leaving out the element of proximate cause.

**2. Courts—Instructions—Expression of Opinion—Corroboration.**

Under the definition of the verb, to corroborate signifies, (1) to make strong or to give additional strength to; to strengthen; (2) to make more certain; to confirm, etc. Therefore, when·the testimony of one witness tends to corroborate another on the trial of a cause, it is reversible error for the judge to instruct the jury that it corroborated his evidence, for it is for the jury to say whether or not it had done so.

APPEAL by defendant from *Peebles, J.,* at October Term, 1915, of WAKE.

Civil action brought to recover damages for personal injuries alleged to have been caused by negligence of the defendant. The particular nature of the cause of action will appear from a recital of material parts of·the testimony.

Charles Lassiter, the plaintiff, in his own behalf, testified: "I have lived in Raleigh about fifteen years, and worked most of that time in the city cemetery. I worked for the defendant for six nights in March of last year. I got hurt on the 23d of March, in the night. I hadn't worked any for the railroad before. They put me to shoveling coal at the coal pit. Leo Black was working with me. The man that worked on the h'ister ·sent me and Leo Black down to the engine to cut down the coal off the engine, and the engine was headed north, and we went down and cut the coal off the engine, and when we came out I got struck on the steps on the left side. We shoveled the coal from the back side of the tender to the front side of the tender. As near as I could guess, it was between midnight and day. I did not have any torch at all; Leo had one, but his went out. When we shoveled the coal from the back ·end of the tender to the front end, we shoveled it all on the tender; then we came back to the coal pit. That night, after shoveling the coal down, I started out of the tender. I started through the cab and down the steps on the left side. I was on the step. I had a jar from the engine when I was coming down the step. Well, it was a jar from another engine. It ran into us. It gave the engine a jar from back side of the tender; on back side at tender. The engine was headed north, and the tender was on the back side. I got hit on the left side by the jar from the steps when I was coming out and it ran in. It hurt me from my knee on up to my side. My knee struck against the steps. I didn't do nothing, but hollered and got down the best I could. Held on to the steps until I got so I could get down. When I started to go down and when this happened my engine had been standing still. I was not able to get out of bed the next day. I was disabled to work any at all for about four months. (Describes his injuries.) Nobody was in the engine with me and Leo Black. I did not know the other engine was going to strike the tender. It was dark˜and we could not see. No bell was rung and no alarm given at all. I am about 43 years old. I had never worked for the railroad before that time. This is down below the sand house. on the Seaboard track. The man that runs the h'ister was the man we worked under. Of course, Mr. Pusey was the main boss man, but he put us under that man. He was the overseer over us, and we worked under his orders."

Leo Black, witness for plaintiff, testified: "I was working for the Seaboard at the time Charlie Lassiter got hurt. I and Charlie went down on the engine to work. It was a freight engine. We were ordered

by the boss, but his name I do not know, and I and Charlie went down there, and I had a torch. We got up on the engine and cut the coal from the back to the front, and after we cut it, I went to pick up the torch and it went out, and we came through the cab, coming out on the left side—on the west—and the torch was out, and I came down first, and Charlie came down behind me, and after I got on the ground some one coupled up to the tender behind, and I could not see any light of the engine, and after he coupled up, Charlie hollered, and I walked on a step or two, and Charlie came up and said he got hurt, and I said where, and he said on his knee, and he went over to where James Gunter and Dave Haywood were. They were working on the ashpan, and he came up to the fire where we all sit, and he kept complaining, and on in the night he said his knee was swollen, and I never saw him any more until about morning; that's about time for us all to knock off, and he was still complaining with his knee, and the next night the boys came back to work, and they said he wasn't able to come back to work. I did not see him any more after he got hurt; he was hurt at the sand track. That was the usual place used to come down—where he got hurt. I didn't hear any signal before the engine struck the tender."

Q. "You say there was a blow when the engine struck the tender?" A. "Well, they coupled up behind, and it made a jar. It was only a jar; all I know, from coupling; just a jar. Of course, it was a hard blow. I don't know whether the engine that came up behind the tender was coupling or not. That's what I supposed. I didn't go around there to look to see whether they were coupled. I don't know who was on the engine. The hostler had been on the engine; I and he was; but he got off. The other engine was brought out there to be worked, I suppose, to go out on the road. They were both headed north. I never saw any one at the time but Charlie Lassiter. The engine that we were on was standing still, and the other came up behind it, and came up against it."

There was some evidence as to the nature and extent of plaintiff's injury, and as to damages, but it is not necessary to be stated.

Defendant requested the court to charge the jury as follows: "If the jury should find that the jar of the engine on which the plaintiff was employed was caused by coupling another engine to this engine, and that this coupling was made in the usual and proper manner, you will answer the first issue 'No.'" This prayer was refused, and defendant excepted.

The judge charged the jury as follows: "The plaintiff goes upon the stand and he says he was shoveling coal from one end of the tender to the end next to the engine, and there was nobody on the engine except another colored man named Leo Black, and when they had finished shoveling the coal, and Leo had gotten down on the ground, that he went

to get off the car; off the tender; and another engine came up behind and butted against the tender and threw him against the steps of the car and injured him. And Leo Black goes upon the stand and corroborates him. The burden is upon the plaintiff as to that issue, and if you are satisfied by the greater weight of the evidence that those are the facts in the case, you will answer the first issue 'Yes.' But Mr. Kaylor is put upon the stand, and he says the defendant the next day, or day after, or two or three days after, when he came for his pay, said·that the plaintiff said he went to get off moving engine and got hurt in that way. If he said that, and you find that to be a fact, you will answer the first issue 'No,' for if he undertook to get off an engine when it was moving, his own negligence was the proximate cause of the injury, and not the negligence of the railroad company." He also instructed the jury as to the measure of damages if the jury answered the first issue affirmatively.

There was a verdict for the plaintiff, and from the judgment thereon the defendant appealed.

*R. N. Simms for plaintiff.*
*Murray Allen for defendant.*

WALKER, J., after stating the case: We do not think that the charge was a sufficient explanation of the law arising upon the evidence, as required by statute, Revisal, sec. 535. There was no statement to the jury as to what would constitute negligence under the circumstances or as to what in law would be considered as the proximate cause of an injury. The jury were told only that if the one engine "butted" against the other and injured the plaintiff, they would answer the first issue "Yes," that is, that there was not only negligence, but that it was the proximate cause of the injury, for both questions were involved in the issue. ·*Fry v. R. R.,* 159 N. C., 357; *McNeill v. R. R.,* 167 N. C., 390; *Treadwell v. R. R.,* 169 N. C., at 701. It is possible that an engine, while a coupling is being made, might butt against the other engine without it being the result of a negligent act on the part of those having control of the moving engine. A coupling produces more or less of a jar, and the engine on which the plaintiff had been shoveling the coal might have been shaken or jarred considerably without there being anything more than the making of an ordinary coupling, in a careful and proper manner. It was for the jury to say whether there was negligence or not. There was evidence of an admission by plaintiff that he was hurt by falling from a moving engine. This he denied, but the conflict in this respect was for the jury to settle. The jury might have inferred that the engine had come up the track for the purpose of being coupled to the other engine which was to be moved to some other place, and that it was not merely a careless and unnecessary butting of the engine

against the other for no purpose whatever. If the jury had found that one of the engines had butted against the tender of the other, this would be some evidence on the question of negligence, but was not necessarily negligence by itself, so as to justify a charge to that effect. It would depend upon the degree of violence with which it was done and upon other circumstances. The jury should have been instructed to find whether there was a violent jar, without any warning to plaintiff, and whether the injury was caused as he testified, his credibility being a question for the jury to consider. There was evidence of negligence, but it was not properly submitted to the jury. They should have been so instructed that they could have found whether or not the jar, under the circumstances, was caused by a negligent act, and not restricted to a single fact, which, standing alone, did not amount to negligence.

We cannot approve an instruction, "that one witness corroborates another," as this is a question of fact to be decided by the jury. We said in *Withers v. Lane,* 144 N. C., at page 189 : "Whether the plaintiff had in fact been contradicted or not was a question for the jury to decide, and not for the court, which might very properly have called attention to the apparent conflict in the testimony, and have explained to the jury the nature of the different kinds of evidence, and it may have been within the judge's province to have stated what the evidence on either side tended to prove, but he could not tell the jury what it actually did prove." The principle is the same in both cases. An intimation that one witness corroborates another is as harmful in its effect upon the jury as one that he contradicts another. One is practically the converse of the other. The approved definition of the verb "corroborate" is "(1) To make strong or to give additional strength to; to strengthen. (2) To make more certain; to confirm; to strengthen." Under any of these definitions, whether we accept the primary or the secondary meaning, the instruction, in effect, told the jury that Leo Black's testimony strengthened or rendered more certain that of the plaintiff, whereas it is the province of the jury to judge of the weight of testimony and as to the effect of the testimony of one witness upon that of another. The reference to the testimony of Leo Black, in connection with the other instruction, rendered the latter more harmful. The tendency of certain testimony to corroborate a witness, and the fact of corroboration, are considered, in law, as two different things. It is for the jury and not for the judge to say how the testimony of a witness is affected by other testimony. *Swan v. Carawan,* 168 N. C., 472. The credibility of witnesses, the weight and sufficiency of testimony, are matters peculiarly within the province of the jury to consider and pass upon.

We are of the opinion that the charge in the respects indicated was not an adequate one, and that the judge inadvertently expressed an

opinion upon the weight of the testimony. There are other questions, but they need not be considered, except the motion to nonsuit, which was properly overruled.

New trial.