STATE OF NORTH CAROLINA v. JOHNNY LEE SPRUILL

No. 280A85

(Filed 7 October 1987)

**1. Criminal Law § 34.7— first degree murder—prior assaults on victim—admissible to show malice**

Evidence that defendant on previous occasions had assaulted the victim was competent to prove his malice toward her and was admissible in a first degree murder prosecution. N.C.G.S. § 8C-1, Rule 404(b).

**2. Criminal Law § 33.4— first degree murder—testimony of victim's mother—admissible**

There was no error in a prosecution for first degree murder where the deceased's mother identified a picture of the deceased taken three weeks before her death, testified that officers at the scene of the crime would not let her see her daughter's body, and testified that the deceased had one little boy. The determinative issue did not depend on the credibility of a State's witness as opposed to the credibility of defendant, the fact that the mother of the deceased was not allowed to see the deceased's body should not have been

───────────

prejudicial to defendant, the court instructed the jury not to consider testimony that the deceased had a child, and the picture of the deceased was not shown to the jury.

**3. Criminal Law § 135.8— first degree murder—aggravating factor—especially heinous, atrocious or cruel**

The evidence in a first degree murder prosecution supported the aggravating factor that the killing was especially heinous, atrocious or cruel where defendant had assaulted his victim on two previous occasions; defendant followed the victim, his former girlfriend, constantly on the night of the killing and would not allow her to leave the nightclub without him; defendant followed the victim when she left the nightclub and pounced on her twice, wounding her the first time and cutting her throat the second, causing her to drown in her own blood; and there was evidence that the victim knew the defendant was following her and that she was in fear of him. N.C.G.S. § 15A-2000(e)(9).

**4. Criminal Law § 135.9— first degree murder—mitigating factor—no peremptory instruction**

The trial court did not err in a prosecution for first degree murder by submitting the mitigating circumstance of mental or emotional disturbance without the requested peremptory instruction where the equivocal testimony of a psychiatrist called by defendant as to defendant's mental and emotional condition was sufficient to make it a jury question as to whether defendant was under the influence of a mental or emotional disturbance at the time of the killing. N.C.G.S. § 15A-2000(f)(2).

**5. Criminal Law § 135.4— first degree murder—sentencing—jury unanimity**

The jury's recommendation at the end of the penalty stage of a first degree murder prosecution was unanimous even though one juror became emotionally upset and hesitated before indicating her concurrence with the death recommendation by nodding her head in the affirmative. N.C.G.S. § 15A-2000(b) requires that the jury be unanimous, but does not specifically require that the juror's assent be manifested by spoken word.

**6. Criminal Law § 135.6— first degree murder—sentencing—admissibility of evidence**

There was no prejudicial error in the penalty phase of a prosecution for first degree murder from a deputy's hearsay testimony that most people defendant had worked for had had trouble with him stealing because no right arising under the U. S. Constitution was affected by the testimony and because the evidence of defendant's cruelty towards the victim was so overwhelming that evidence that some people said that defendant had stolen property would not have affected the outcome. Testimony that people said defendant had assaulted his females several times went to character or reputation, which is based on what people say or do not say about a person, and was admissible.

**7. Criminal Law § 135.10— first degree murder—sentencing—proportionality review**

There was nothing in the record of a first degree murder prosecution to suggest that the sentence of death was imposed under the influence of passion,

prejudice, or other arbitrary factors, and the death penalty was not excessive or disproportionate. N.C.G.S. § 15A-2000(d)(2).

APPEAL by defendant from a death sentence imposed at the 29 January 1985 Session of NORTHAMPTON County Superior Court, *Smith (Donald L.), Judge*, presiding. Heard in the Supreme Court 14 April 1987.

The defendant was tried for the first degree murder of his former girlfriend Beatrice Williams. The State's evidence showed that on the night of 31 March 1984, Beatrice Williams and her friend Laura Scott went to Jasper's, a nightclub located on Highway 301 near Pleasant Hill, North Carolina. The defendant was there. The defendant and Beatrice Williams had been "dating for quite a while" but Beatrice Williams had recently broken off their relationship. During the evening the defendant "hounded" Beatrice Williams, following her every step and movement and not letting her out of his sight.

Laura Scott approached Harold Williams, an employee of Jasper's, and requested Williams' aid in stopping defendant from his actions. After observing the defendant and Beatrice Williams conversing, Harold Williams said that "the two were only talking, . . . and there's nothing I can do about that."

Later Harold Williams observed the defendant and Beatrice Williams enter the lobby of the nightclub with Laura Scott as if they were leaving together. Williams testified that Beatrice Williams "was rubbing her hands and she looked like she had tears in her eyes . . ., her knees were shaking as if she didn't know what to do." During this period of a few minutes, defendant remained close to Beatrice Williams moving every time she moved "shoulder to shoulder with her." During this entire period defendant had his hand in his coat pocket and did not remove it at any time. As Beatrice Williams started to exit the club, Harold Williams volunteered to escort her to her car, hoping to discourage the defendant's actions, "so he wouldn't do anything." As Harold and Beatrice Williams and a trailing defendant exited the nightclub Laura Scott drove the automobile to the front of the building to pick up Ms. Williams. As Ms. Williams opened the door to the car, defendant moved towards the vehicle and the victim. Harold Williams then told the defendant to "leave her alone," to which the

defendant replied "[m]an, I ain't going to do nothing to her." A few minutes later the defendant began chasing Ms. Williams around the car and Harold Williams heard the victim say "Johnny don't." At that point Harold Williams ran back into the club to call the police. When he returned to the outside, the defendant was in the front seat of the car on top of Beatrice Williams. Harold Williams, with the aid of Joseph Jackson, pulled the defendant from Beatrice Williams. Harold Williams and Jackson testified that the victim had blood on her hands and chest, they further observed cut marks in both areas. Harold Williams ran back into the club to call the rescue squad; and while Jackson held the defendant, the victim managed to pull the car up a few feet and stop. Witness Jackson was concerned for the victim's welfare so he let go of the defendant and attempted to open the door on the driver's side of the vehicle. Jackson found the door was locked and upon looking back to find the defendant he noticed that the defendant had walked around the vehicle, entered from the passenger's side and was "up on the seat with a knife." Jackson then ran back around the car to get to the defendant but by the time he arrived defendant had cut Beatrice Williams' throat. Jackson pulled the defendant off the victim and heard the defendant say, "I meant to do it; I meant to do it." Jackson observed Ms. Williams' throat to be "open," with the only audible sounds coming from the victim to be a "bubbling noise" as she attempted to speak. A rescue squad vehicle arrived on the scene some twenty-five minutes later.

The defendant then "folded his knife up and put it inside his pocket, . . . and walked off as if nothing had happened." Defendant was picked up and arrested approximately one mile from the scene by a highway patrolman.

According to the testimony of Dr. Louis Levy, a pathologist, the victim died as a result of "drowning in her own blood," when blood rushed into the airway or trachea region of the throat, forming a "foaming" physical block to the passage of air. Dr. Levy described the wound to the neck as extending over six inches long from about the angle of the jaw forward and into the windpipe which was laid open. Dr. Levy testified that the cartilage section which the defendant cut through was probably the toughest cartilage in the body, and that even with a very sharp knife it

would have taken considerable force and effort to sever such an area.

At the guilt phase of defendant's trial the State, over objection of the defendant, offered the testimony of two witnesses, Lemile Lockart and Helen Britton. They testified about two separate incidents prior to the murder when the defendant had assaulted the victim. The defendant did not offer evidence during the guilt phase of the trial. The jury returned a verdict of guilty.

At the penalty phase of trial the defendant offered evidence of a psychologist and a psychiatrist as well as five character witnesses. Defendant was diagnosed as having a low IQ (64), as well as a personality disorder. The evidence showed the defendant to be epileptic, and to have a long history of seizure disorders. The jury recommended the death penalty. From a sentence of death the defendant appealed.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*A. Jackson Warmack, Jr. and Thomas L. Jones, Jr., for defendant appellant.*

WEBB, Justice.

GUILT PHASE

[1] The defendant first assigns error to the testimony of the witnesses Lockart and Britton which showed there had been prior altercations between the defendant and Beatrice Williams. He argues that this testimony was only relevant to prove his character in order to show he acted in conformity therewith in killing Beatrice Williams. N.C.G.S. § 8C-1, Rule 404(b) prohibits evidence of other crimes, wrongs or acts to prove the character of a person in order to show he acted in conformity therewith. If evidence of the other acts tends to prove any other relevant fact such evidence is not excluded.

In *State v. Moore*, 275 N.C. 198, 166 S.E. 2d 652 (1969), the defendant was convicted of the murder of his wife. This Court held that evidence was admissible which showed the defendant had assaulted his wife on several occasions prior to the day he killed her. This Court said the evidence of ill treatment of the

deceased by her husband over a period of time was relevant to prove his malice toward her, malice being an essential element of first degree murder. We hold that the evidence that defendant on previous occasions had assaulted Beatrice Williams was competent to prove his malice toward her and was admissible. Other cases which hold that evidence of other assaults is admissible in homicide cases are *State v. King*, 301 N.C. 186, 270 S.E. 2d 98 (1980); *State v. Ray*, 212 N.C. 725, 194 S.E. 2d 482 (1938); *State v. Spinks*, 77 N.C. App. 657, 335 S.E. 2d 786, *affirmed*, 316 N.C. 547, 342 S.E. 2d 522 (1986); and *State v. Beam*, 70 N.C. App. 181, 319 S.E. 2d 616 (1984).

[2] In his second assignment of error the defendant contends that certain testimony of the deceased's mother was prejudicial. The mother testified that she drove to Jasper's after she heard her daughter had been cut but the officers would not let her see her daughter's body. The deceased's mother was asked on direct examination whether the deceased had any children. An objection to this question was sustained but the mother nevertheless answered that the deceased had "one little boy." The court then instructed the jury to disregard this testimony. The mother also identified a picture of the deceased taken three weeks before her death but the picture was not shown to the jury.

The defendant contends that the above testimony was irrelevant to any issue in the case and its only effect was to create prejudice against him. He contends that pursuant to *State v. Page*, 215 N.C. 333, 1 S.E. 887 (1939), he is entitled to a new trial. In *Page*, this Court ordered a new trial after the defendant had been convicted of rape. The prosecuting witness was allowed to testify that she was a widow supporting a young child and she had been forced to take a job with a show because there was no other work for her. This Court said this testimony was irrelevant and could "arouse in the minds of the jury sympathy for the prosecutrix and to excite therein prejudice against the accused." This Court said that because the determinative question for the jury was whether the prosecuting witness or the defendant was to be believed, the admission of this testimony was prejudicial.

*Page* is easily distinguishable from this case. In this case, the determinative issue does not depend on the credibility of a state's witness as opposed to the credibility of the defendant. The

defendant in this case did not testify. There were several witnesses for the State who testified to the essential elements of the crime. In addition, we do not believe the testimony which the defendant finds objectionable would create sympathy for the victim or prejudice to the defendant. The fact that the mother of the deceased was not allowed by the officers to see the deceased's body shortly after she died should not have been prejudicial to the defendant. The court instructed the jury not to consider testimony that the deceased had a child and we presume the jury followed the court's instruction. *Apel v. Coach Co.*, 267 N.C. 25, 147 S.E. 2d 566 (1966). The deceased's mother was allowed to identify a picture of the deceased but the picture was not shown to the jury. We hold this was not prejudicial to the defendant. This assignment of error is overruled.

### SENTENCING PHASE

[3] The defendant has made four assignments of error to the sentencing phase of the trial. He contends first that there was not sufficient evidence to support a finding of the aggravating circumstance that the murder was especially heinous, atrocious or cruel. N.C.G.S. § 15A-2000(e)(9). This Court has held that to support this aggravating circumstance the evidence must show that the level of brutality exceeds that normally found in first degree murders or that the murder is conscienceless, pitiless or unnecessarily torturous to the victim. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). We have also said that it is appropriate to find this aggravating circumstance when the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in murder cases. *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984). We have said that two types of murder that fall in this category are those which are physically agonizing for the victim or which are in some other way dehumanizing and the type of killing which is less violent but involves the infliction of psychological torture by leaving the victim in his last moments aware of, but helpless to prevent, impending death. *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983).

We hold that the evidence in this case supports the aggravating circumstance that the killing was especially heinous, atrocious or cruel. The defendant had assaulted his victim on two previous occasions. On the night of the killing the defendant "coattailed"

the victim, constantly following her and her companion and would not allow them to leave the nightclub without him. When she left the nightclub he followed her and when he had the opportunity he pounced on her not once but twice. He wounded her the first time and cut her throat the second time, causing her to drown in her own blood. We believe this evidence supports a finding that the level of brutality exceeds that normally found in first degree murder cases and that it was pitiless and unnecessarily torturous to the victim. In *State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673, *cert. denied*, --- U.S. ---, 93 L.Ed. 2d 166 (1986), one of the contributing causes to the victim's death was the cutting of the victim's throat and we held that this supported a finding that the victim had an agonizing death. The same reasoning applies in this case. This case is not, as contended by the defendant, governed by *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984), in which the defendant followed his victim but the evidence did not show the victim feared for his life prior to the time he was shot. There was no evidence in *Moose* that the deceased lingered after he was shot. This Court held this was not sufficient evidence that the deceased knew he was being stalked to cause him to suffer psychological torture. In this case the evidence is that the victim knew the defendant was following her and that she was in fear of him. The jury could conclude from this evidence that she suffered psychological torture.

[4]    The defendant next assigns error to the refusal of the court to give a peremptory instruction on the mitigating circumstance listed at N.C.G.S. § 15A-2000(f)(2), "The capital felony was committed while the defendant was under the influence of mental or emotional disturbance." The court submitted this mitigating circumstance but did not give the requested peremptory instruction. The defendant called as witnesses at the sentencing hearing Michael Hewitt, a clinical psychologist, and James Gray Groce, a psychiatrist. Dr. Groce testified that he had examined the defendant and, in his opinion, the defendant was mildly mentally retarded and this could be classified as a mental impairment. On cross-examination he testified he could not say the defendant had an emotional disorder. Dr. Groce did not testify that the defendant had a mental disturbance. Dr. Hewitt testified that he diagnosed the defendant as having "an atypical personality disorder" which is "a mental or emotional disorder."

The defendant contends that the testimony of Dr. Groce and Dr. Hewitt presented uncontradicted testimony that he was under the influence of a mental or emotional disturbance at the time Beatrice Williams was killed and pursuant to *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979), he was entitled to a peremptory instruction on this mitigating circumstance. We . hold the defendant was not entitled to such an instruction. Dr. Groce testified that after examining the defendant he could not say the defendant had an emotional disorder. This is evidence that he was not under the influence of an emotional disturbance. Other testimony of Dr. Groce was to the effect that the defendant had a mental impairment. We believe this evidence is more probative of the mitigating circumstance listed at N.C.G.S. § 15A-2000(f)(6), "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." This mitigating circumstance was submitted to the jury but not found by them. The use of the word "disturbance" shows the General Assembly intended something more in the mitigating circumstance at N.C.G.S. § 15A-2000(f)(2) than mental impairment which is found in another mitigating circumstance. The equivocal testimony of Dr. Groce as to the mental and emotional condition of the defendant is sufficient to make it a jury question as to whether he was under the influence of a mental or emotional disturbance at the time of the killing.

[5]  By his sixth assignment of error defendant contends the trial court erred in accepting the recommendation of the trial jury at the penalty stage, in that the recommendation of the jury was not unanimous as required by N.C.G.S. § 15A-2000(b).

During the course of polling the jury at the end of the penalty phase of trial, one of the jurors, Mrs. Bernice Scott, became emotionally upset and hesitated before indicating her concurrence with the death recommendation by nodding her head in the affirmative.

During the polling of the jury the following took place:

THE COURT: Bernice G. Scott, would you please stand. Mrs. Scott, your presiding officer has returned as the jury's unanimous verdict that the defendant, Johnnie Lee Spruill, be sentenced to death; is that your verdict, ma'am?

Would you like to sit and think for a minute, Mrs. Scott?

Sheriff, would you please give her a cup of water, please.

(REPORTER'S NOTE: The juror, Bernice G. Scott, was crying and appeared at the time unable to speak.)

THE COURT: All right, Mrs. Scott, would you please stand, ma'am. Mrs. Scott, your presiding officer has returned as the jury's unanimous verdict that the defendant Johnnie Lee Spruill, be sentenced to death; is that your verdict, ma'am?

BERNICE SCOTT: Yes—(Juror nods head affirmatively.)

THE COURT: And do you still assent thereto?

BERNICE SCOTT: (Juror nods head affirmatively.)

THE COURT: Thank you, ma'am. Be seated.

N.C.G.S. § 15A-2000(b) requires that the jury, during the sentencing phase of a capital case, be unanimous in its recommendation before the death sentence can be imposed on a defendant. Although citing no authority, defendant contends that based on the above quoted transcript, the verdict of the jury was not unanimous when polled in open court. Defendant argues that juror Scott's actions were unclear and that she did not give the requisite affirmative assent necessary to fulfill the required unanimous decision set forth in N.C.G.S. § 15A-2000(b).

N.C.G.S. § 15A-2000(b) reads in part:

The sentence recommendation must be agreed upon by a unanimous vote of the 12 jurors. Upon delivery of the sentence recommendation by the foreman of the jury, the jury shall be individually polled to establish whether each juror *concurs and agrees* to the sentence recommendation returned. (Emphasis added.)

Thus each juror must *concur and agree* with the ultimate judgment rendered. N.C.G.S. § 15A-2000(b) does not specify how or by what method this concurrence and agreement should be expressed. It does not specifically require, as defendant contends, that the juror's assent be manifested by spoken word. Rather the crucial aspect for consideration is whether there was a concurrence with the jury verdict, not the manner in which agreement

is manifested. Here, the juror in question made an affirmative physical act (nodding of head in affirmation) as to the verdict. There was no evidence of coercion or pressure placed on the juror by any of the parties present, rather the juror's actions were voluntary in nature. Therefore, we hold that the juror's actions were sufficient to meet the requirement of N.C.G.S. § 15A-2000 (b). Accordingly, this assignment of error is overruled.

[6] In his seventh assignment of error the defendant contends it was error at the sentencing hearing for the State to elicit from Deputy Sheriff Theodore Bynum certain testimony in rebuttal. After asking several questions to which objections were sustained the following colloquy occurred.

Q. Well, can you tell the members of the jury the way he acts, the way he is around other people?

. . . .

A. Well, he's a pretty good worker and mechanic, but most people that he works for, they have a little trouble with his stealing.

. . . .

Q. Do you know his character and reputation—do you know what his character and reputation is in the community in which he lives, that is, what other people—

MR. WARMACK: Object.

BY MR. BEARD:

Q. . . . . say about him?

THE COURT: Overruled.

BY MR. BEARD:

Q. Do you know what it is?

A. Yes, sir.

Q. What is it?

. . . .

A. From what people say, he assaulted his females several different times.

The court submitted as a mitigating factor a question as to whether defendant was a person of good character and reputation. This testimony was relevant to rebut the defendant's evidence on this mitigating circumstance. The first question was not in regard to character or reputation. The answer seems to be based on what people said about the defendant. This makes it hearsay and it should have been excluded. The second question is in form a question as to the character or reputation of the defendant. The witness testified, "From what people say, he assaulted his females several different times." Reputation is based on what people say or do not say about a person. 1 Brandis on North Carolina Evidence § 102 (1982). The answer of the witness to the second question could have been in better form but we hold it was not error to admit it.

We hold it was not prejudicial error to admit the answer to the first question. No right arising under the United States Constitution is related to this testimony. The burden is on the defendant to prove that had the error not been committed a different result would have been reached, N.C.G.S. § 15A-1443(a). *State v. Billups*, 301 N.C. 607, 272 S.E. 2d 842 (1981). We hold there was not a reasonable possibility that had this hearsay evidence not been introduced the result would have been different. The evidence of the defendant's treatment of Beatrice Williams was so overwhelming as to his cruelty to her that evidence that some people had said he had stolen property would not have affected the outcome. We hold this was harmless error.

PROPORTIONALITY REVIEW

[7] Having determined there is no error in the guilt or penalty phase of the trial sufficient to require a new trial or sentencing hearing, we are required by N.C.G.S. § 15A-2000(d)(2) to determine (1) whether the record supports the jury's finding of the aggravating circumstance upon which the sentence of death was imposed, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence is excessive or disproportionate to the penalty imposed in the pool of similar cases, considering both the crime and the defendant.

As to the influence of passion, prejudice or other arbitrary factors on the sentence imposed, we can find nothing in the rec-

ord to suggest that the sentence of death was imposed under the influence of any of these factors. We have held that the record supports the jury's finding of the single aggravating circumstance "that the murder was especially heinous, atrocious and cruel." N.C.G.S. § 15A-2000(e)(9). In our discussion of this circumstance, we pointed out how the evidence supported this factor.

In dealing with a review as to whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant" in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983), this Court said it would use a "pool" of cases which included:

> *[A]ll cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

This pool includes only those cases which this Court has found to be error free in both phases of trial. *State v. Jackson*, 309 N.C. 26, 45, 305 S.E. 2d 703, 717 (1983).

In *State v. Lawson*, 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985), we said that in comparing a case with those in the pool, we would limit our consideration to those cases "roughly similar with regard to the crime and the defendant." We also said:

> If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*Lawson*, 310 N.C. at 648, 314 S.E. 2d at 503.

Distinguishing features of this case are: (1) it is a case of first degree murder, preceded by prior physical and mental abuse of the victim; (2) it is a case in which a single aggravating factor was found, "that the killing was especially heinous, atrocious or cruel," N.C.G.S. § 15A-2000(e)(9); (3) it is a case in which no mitigating factors were found, although five were submitted to the jury; and (4) it is a case in which defendant showed no remorse for his actions, and appeared in full control of his mental and physical condition.

The defendant cites sixteen cases from the pool of cases which he says involve killings in which the victim was the father, mother, wife, ex-wife, husband, in-law, girlfriend, son or daughter. In all these cases the defendant was convicted of first degree murder. In twelve of the cases the jury recommended life in prison and in four of them the jury recommended the death penalty. These cases are *State v. Spangler*, 314 N.C. 374, 333 S.E. 2d 722 (1985); *State v. Harold*, 312 N.C. 787, 325 S.E. 2d 219 (1985); *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985); *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L.Ed. 2d 342 (1985); *State v. King*, 311 N.C. 603, 320 S.E. 2d 1 (1984); *State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324 (1985); *State v. Henson*, 310 N.C. 245, 311 S.E. 2d 256, *cert. denied*, 469 U.S. 839, 83 L.Ed. 2d 78 (1984); *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587 (1984); *State v. Woods*, 307 N.C. 213, 297 S.E. 2d 574 (1982); *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, 454 U.S. 933, 70 L.Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L.Ed. 2d 655 (1981); *State v. Anderson*, 303 N.C. 185, 278 S.E. 2d 238 (1981); *State v. Parton*, 303 N.C. 55, 277 S.E. 2d 410 (1981); *State v. Clark*, 300 N.C. 116, 265 S.E. 2d 204 (1980); *State v. Franks*, 300 N.C. 1, 265 S.E. 2d 177 (1980); *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980); and *State v. Colvin*, 297 N.C. 691, 256 S.E. 2d 689 (1979).

Most of the cases have facts which distinguish them from this case. In *Harold, King, Henson, Adcock, Woods, Anderson, Myers,* and *Colvin* the killings were by gunshot and there was no evidence of suffering as there is in this case. In *Clark* there was much more evidence that the defendant was mentally deranged than in this case. A psychiatrist testified the "defendant might

have had a psychotic break and therefore would not have known right from wrong at the time of the stabbing." In *Spangler* and *Adcock*, there was also evidence the defendants did not know right from wrong at the time of the killings. In *Franks*, a psychiatrist testified that in his opinion defendant "suffered then, as he does now, from chronic undifferentiated schizophrenia." The psychiatrist testified that, in his opinion, the defendant did know right from wrong at the time of the killing.

We believe the cases of *Martin, Boyd, Noland* and *Huffstetler* are similar to this case.

In *Martin*, the defendant was tried and convicted of first degree murder for the shooting death of his wife. As in the present case, the evidence showed that the murder was preceded by prior threats against the victim, that defendant followed the victim to the crime scene, that the crime involved a great deal of pain and suffering, that the murder was not done in a quick and efficient manner (the defendant shot and pistol whipped the victim over a twenty-five minute span), that the victim was murdered in a public place in full view of witnesses, and that defendant suffered some mental and emotional disorders. In *Martin*, this Court upheld the death sentence citing the manner in which death was inflicted and the prior threats of death which preceded the actual crime by some six months.

In *Boyd*, this Court sustained a death sentence wherein the murder evolved from the separation of defendant from a woman he purportedly loved. Defendant threatened the victim several times prior to following her to a shopping mall where he stabbed her over thirty times in front of her family and friends. As in the present case, defendant showed no remorse after the killing. As in *Martin*, and the present case, the Court in *Boyd* found N.C.G.S. § 15A-2000(e)(9) as an aggravating circumstance to the crime. In upholding the sentence of death, this Court cited the overwhelming evidence of guilt, the prior threats by defendant, and the heinous nature of the crime including the suffering of the victim.

In *Noland*, the evidence showed defendant was upset because his wife had left him and taken their children. After trying unsuccessfully to convince her to return, defendant threatened to kill her and members of her family. Defendant made these threats several times over the course of approximately a three month

period. When his wife did not return, defendant killed his wife's sister and father and seriously wounded her mother. As in the present case, there was some evidence defendant suffered from mental and emotional problems, however the Court citing the heinous, atrocious and cruel circumstances, the prior threats and beatings of the victim, and the carefully planned and executed nature of the murders themselves, sustained the sentence of death.

Finally, in *Huffstetler*, defendant was convicted of the first degree murder of his mother-in-law, based on evidence tending to show that he had beaten her to death with a skillet. As in the present case there was evidence of the severe and brutal nature of the crime (the force necessary to cave the victim's skull in and break the jaw), a lack of remorse shown by defendant, and the defendant's cool actions after the murder. Based on these factors, this Court concluded the sentence of death entered was not disproportionate.

*Martin, Boyd,* and *Huffstetler,* have characteristics present in this case: (1) prior assaults and threats directed to the victim by defendant; (2) fear on the part of the victim; (3) a calculated plan of attack by defendant; (4) a senseless, brutal, and forceful public killing found to be especially heinous, atrocious or cruel by a jury, N.C.G.S. § 15A-2000(d)(2); (5) a period of time in which the victim suffered a high degree of physical and mental pain prior to death; and (6) a distinct lack of remorse exhibited by defendant after the murder. *Noland* also has these characteristics except the jury did not find as an aggravating circumstance that the murder was especially heinous, atrocious or cruel.

The defendant relies on *Adcock* and *Harold* as being similar to this case. In *Adcock*, the defendant was convicted of murdering his estranged wife. The evidence showed that after threatening his wife on several previous occasions, he shot her while following her in his automobile. The vehicle which his wife was driving came to a stop and he shot her again. The jury recommended life in prison. We have said that *Adcock* is distinguishable from this case in that the victim did not suffer in *Adcock* as in this case and there was evidence in *Adcock* that the defendant did not know right from wrong at the time of the killing.

In *Harold*, the defendant after pursuing his former girlfriend, shot her at point blank range as she begged for mercy. There was no evidence that she suffered after she was shot. The circumstances of that killing do not seem to be as brutal as the circumstances of this case. Another case which is somewhat similar to this case is *Parton*. In *Parton*, a witness testified he saw the victim "lying on the ground with a rope around her neck, gasping for air. Defendant then pulled the rope tighter and choked her until she died." There was some evidence that the defendant in *Parton* was under the influence of drugs at the time of the killing and there was no evidence that the defendant stalked his victim. These circumstances distinguish it from this case.

The defendant also relies on six cases in which this Court has held that a death sentence was not appropriate. These cases are *State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653 (1987), which involved a robbery and murder by a group of men; *State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986), which involved the murder of a bystander by mistake while attempting to murder another man; *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985), which dealt with a robbery and murder by a group; *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984), which involved the murder of a law enforcement officer pursuing the defendant; *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983), which dealt with a death from a gunshot wound in which the defendant sought medical assistance for the victim; and *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983), which involved a robbery and murder. All these cases are factually distinguishable from this case and are not similar for purposes of proportionality review.

We hold that the four cases which are most similar to this case are *Martin, Boyd, Noland* and *Huffstetler*. In all of them the death penalty was affirmed. We hold the death penalty imposed in this case is not excessive or disproportionate.

The defendant has made twelve assignments of error as to questions which he concedes have previously been decided against the positions he advances in this case. He raises them to give this Court an opportunity to reconsider them. This we decline to do.

In the trial and sentence we find

No error.